*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ZACHARY NEWMEYER,

        Petitioner-Appellant,

v

DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

        Respondent-Appellee.

UNPUBLISHED
March 31, 2022

No. 355509
Allegan Circuit Court
LC No. 20-062537-AA

Before: RIORDAN, P.J., and K. F. KELLY and SWARTZLE, JJ.

PER CURIAM.

Petitioner, Zachary Newmeyer, appeals by leave granted[1] the circuit court's order affirming the administrative law judge's order finding that Newmeyer's placement on the Child Abuse and Neglect Central Registry was appropriate. Newmeyer raises multiple issues on appeal. Stated succinctly, Newmeyer argues that these proceedings were based on an unlawful search of his home; the administrative law judge erred by admitting evidence during the bench trial; there was not sufficient evidence to support the decisions of the administrative law judge and the circuit court; the assessment process by Children's Protective Services under the Child Protection Law, MCL 722.621 *et seq.*, was unconstitutional; and res judicata required the administrative law judge and circuit court to find that Newmeyer was not a danger to his daughter. We affirm.

## I. BACKGROUND

This case arises out of a complaint made to Children's Protective Services in June 2018 that Newmeyer was making butane-hash oil at a residence in Plainwell, Michigan. The complaint alleged that the butane-hash oil endangered Newmeyer's daughter, BNM. At the time, Newmeyer had 18 hours of parenting time with BNM each week; she was scheduled to have a visit with Newmeyer at the residence on June 8, 2018. Instead, Children's Protective Services and the police

---

[1] *Newmeyer v Department of Health and Human Services*, unpublished order of the Court of Appeals, entered April 12, 2021 (Docket No. 355509).

searched the residence that day. This case—and Newmeyer's eventual placement on the Central Registry—stems from that search.

A. EVENTS LEADING TO NEWMEYER'S PLACEMENT ON THE CENTRAL REGISTRY

On June 2, 2018, Children's Protective Services received a complaint that Newmeyer might be producing butane-hash oil and that BNM could be exposed to it. The case was assigned to Maria DeJonghe, a Children's-Protective-Services investigator, and she reviewed Newmeyer's criminal and Children's-Protective-Services history. DeJonghe's searches revealed that Children's Protective Services had received three prior complaints about Newmeyer; one had been substantiated, but two had not. The substantiated event related to an October 2014 incident in which BNM was allegedly exposed to marijuana while in Newmeyer's care. Newmeyer had been placed on the Central Registry in 2014, but he was later removed from the Central Registry and was not on the Central Registry at the time of the June 2, 2018, complaint. Regarding Newmeyer's criminal history, DeJonghe learned that, in December 2014, police found four pounds of marijuana, marijuana wax, a digital scale, and "several individual baggies" in Newmeyer's car. Newmeyer eventually pleaded guilty to misdemeanor possession of cocaine and entered into a diversion program.

DeJonghe conducted a home visit of the residence on June 4, but Newmeyer was not there at the time. DeJonghe talked with Newmeyer's girlfriend, who stated that Newmeyer lived in Kalamazoo and not at the residence. DeJonghe, however, did notice a basket containing 20-30 butane cannisters on the porch outside the residence; she also smelled marijuana. Newmeyer's girlfriend informed DeJonghe that Newmeyer had a medical-marijuana card and allowed DeJonghe to enter the residence to view the kitchen. The kitchen appeared clean to DeJonghe, but she did not fully inspect it. DeJonghe was concerned following the visit because she knew butane was a key component of butane-hash oil, which corroborated the allegation that Newmeyer was making butane-hash oil at the residence. DeJonghe later spoke on the phone with Newmeyer; he claimed that BNM's mother was "setting him up" and he did not live in Plainwell, and he stated that he would not meet DeJonghe in Plainwell.

On June 8, 2018, DeJonghe learned that Newmeyer wanted to have parenting time with BNM that afternoon at the residence. This concerned DeJonghe because she was not confident the residence was safe for BNM to visit so she asked another Children's-Protective-Services investigator, Bridget Buell, to visit the residence to ensure it was safe for BNM. Buell and Plainwell Police Deputy Director John Varley went to the residence that day to inspect the residence. When they arrived, Newmeyer was in his front yard and told Buell that BNM's mother set him up.

Buell explained the allegations to Newmeyer; Newmeyer's father—who was also his attorney throughout this case—was on the phone and listening as this occurred. Buell explained that she needed to inspect the residence to ensure it was safe for BNM to visit and that there was not any "drug production" at the residence. Buell informed Newmeyer that she was there because she had information about butane-hash oil at the residence; she also asked Newmeyer about his marijuana use. Newmeyer denied manufacturing any butane-hash oil at the residence. Buell asked Newmeyer if she could enter the residence to ensure it was safe for BNM, but Newmeyer refused. Buell then purportedly explained to Newmeyer that if she could not search the residence then

-2-

"possibly [Newmeyer's] parenting time would then have to be suspended for that day because [BNM] was to be dropped off" at the residence. Newmeyer walked away for a few minutes to talk with his attorney; when he returned he told Deputy Director Varley and Buell that they could search the residence.

Newmeyer walked Deputy Director Varley and Buell around the back of the residence and allowed them to enter the residence. Buell and Deputy Director Varley noticed a basket with 27 empty butane cannisters on the porch. Once inside, Deputy Director Varley found a covered container of dark liquid in the refrigerator. Deputy Director Varley removed the lid, smelled a strong scent of marijuana, and immediately identified the liquid as butane-hash oil. Deputy Director Varley then detained Newmeyer and called for backup.

John Damveld, a Sergeant in the Allegan County Sheriff's Department, then arrived and also identified the liquid as butane-hash oil. Newmeyer was taken into custody and placed in a patrol car. Shortly thereafter, Deputy Director Varley returned to the office and wrote a search-warrant application.

The search warrant was issued the same day and Deputy Director Varley returned to the residence with additional officers to search the residence. When executing the search warrant, Deputy Director Varley and the other officers looked for items that would be dangerous to a child, such as "drug paraphernalia and more signs of butane hash oil." During the search, they found Newmeyer's passport, driver's license, checkbook, and prescription containers in the bedroom. Deputy Director Varley found multiple "bongs" as well as six or seven butane containers in the bedroom. A shelf in the closet also had a "torch" on it that could be used with a butane cannister. Deputy Director Varley additionally found a pie crust in the refrigerator that "had a strong scent of marijuana." Deputy Director Varley then emptied the basket full of butane cannisters on the porch; he found a bag with 16 grams of shaved marijuana at the bottom of the basket.

Deputy Director Varley sent samples of the pie crust and the butane-hash oil to the Michigan State Police Crime Lab. Both items tested positive for delta-1-tetrahydrocannabinol (THC). The prosecutor's office issued criminal charges based on the lab-test results. Newmeyer eventually pleaded guilty to disturbing the peace, MCL 750.170, as a result of those charges. He did not receive any jail time or probation.

DeJonghe completed a risk assessment on July 2, 2018. DeJonghe scored points for neglect and abuse factors on a form titled "Family Risk Assessment of Abuse/Neglect." This resulted in a neglect score of 10, which corresponded to an "intensive" risk level. Based on her conclusions following the risk assessment, DeJonghe recommended placing Newmeyer on the Central Registry. Newmeyer received notice ten days later that he had been placed on the Central Registry due to "improper supervision" and "threatened harm." The notice informed Newmeyer that he could challenge his placement by filing a petition for an administrative hearing. Newmeyer filed a petition two days later to remove his name from the Central Registry. That petition initiated the administrative proceedings in this case.

Parallel with this, DeJonghe petitioned to remove BNM from Newmeyer's custody on July 16, 2018. The petition and ensuing child-protective proceeding will be addressed in greater detail later.

## B. AGENCY PROCEEDINGS

The administrative proceedings resulted in a bench trial before an administrative law judge. The following additional evidence was elicited at trial:

### 1. NEWMEYER'S CRIMINAL HISTORY

Newmeyer was pulled over in December 2014; police found four pounds of marijuana, marijuana wax, a digital scale, and "several individual baggies" in Newmeyer's car. That case eventually concluded with Newmeyer pleading guilty to misdemeanor possession of cocaine and entering into a diversion program. Newmeyer's attorney repeatedly argued during the bench trial in this case that police misconduct related to Newmeyer's cocaine-possession conviction made any reliance on that conviction improper. That said, DeJonghe testified that she based her findings about Newmeyer's criminal history on his conviction, not anything found in police reports of the matter other than the fact that it further linked Newmeyer to marijuana. Specifically, the allegations from Newmeyer's attorney about improper police practices in the 2014 case did not have any impact on the weight she gave to the police report she viewed from that case. Rather, DeJonghe relied on the police report only to the extent that it linked Newmeyer to marijuana because it established a pattern connecting Newmeyer to marijuana and of criminal involvement.

### 2. THE SEARCH

Newmeyer's attorney primarily attacked the validity of the June 8, 2018 search in two ways during the bench trial. First, by arguing that Newmeyer was coerced into allowing the search. And second, by arguing that Deputy Director Varley intentionally omitted information about a field test of the butane-hash oil from his search-warrant application.

Deputy Director Varley dictated a police report the evening of the search. The police report stated that Buell told Newmeyer that if he did not allow them to search the residence, then she "would" suspend his parenting time at the residence. Deputy Director Varley asserted at the bench trial, however, that the word "would" was a mistake and that it instead should have been "could." Newmeyer's attorney then showed Deputy Director Varley his search-warrant application, which used the word "would." When faced with that evidence, Deputy Director Varley stated that he might have also said "would" when dictating his police report.

According to Buell, she never told Newmeyer that "his parenting time would be suspended permanently or his parental rights would be terminated or anything along those lines." Rather, she told Newmeyer that "possibly his parenting time would then have to be suspended for that day because [BNM] was to be dropped off" at the residence.

For his part, Newmeyer stated that he was "coerced into [the June 8, 2018] search." He was, however, able to talk to his attorney on the phone before consenting to the search. Newmeyer kept his attorney on the phone as he walked into the house.

As for the butane-hash-oil field test, Deputy Director Varley asked Sergeant Damveld to examine the butane-hash oil when he first left the residence. The field test was inconclusive. Deputy Director Varley and Sergeant Damveld disagreed about whether Sergeant Damveld told

Deputy Director Varley that the field test of the butane-hash oil was inconclusive before Deputy Director Varley left to write his search warrant application. As explained by Sergeant Damveld, the field test changed the color of liquid when it produced a positive result, and the result was almost always inconclusive when testing a dark substance because "it would be like to try to pour coffee into water. It's going to turn dark." The type of field test Sergeant Damveld performed can only give one of two results: inconclusive or positive. Sergeant Damveld did not consider the inconclusive test result important because there was "no doubt in [his] mind" that the substance was butane-hash oil. And, in any event, regardless of the field-test result, Sergeant Damveld would have sent the substance to the crime lab to get tested. According to Deputy Director Varley, however, Sergeant Damveld did not tell him the field-test result before he left to get the search warrant.

### 3. WHETHER NEWMEYER LIVED AT THE RESIDENCE

Newmeyer had 18 hours of parenting time each week in June 2018. According to BNM's mother, Newmeyer lived at the residence in June 2018, and he had her drop BNM off at the residence for his parenting time on multiple occasions. BNM's mother believed Newmeyer lived at the residence because he frequently had her drop BNM off there for his parenting time, and BNM's mother would often see his vehicle in the driveway when she passed it on her way to her parents' house.

Regarding the items in the bedroom that apparently belonged to Newmeyer, Newmeyer admitted that his checkbook, passport, and prescription pills were at the residence. The address on Newmeyer's checks found in the residence's bedroom was not the address for the residence. According to Newmeyer, all of the listed items were there because he needed them for his job in Grand Rapids. Newmeyer was often at the residence to fix it up because it had fallen into disrepair, but he insisted that he did not live there.

Sergeant Damveld testified that a checkbook, prescription bottles, and a passport would all be relevant in a narcotics investigation to help prove residency. As explained by Sergeant Damveld, most people do not leave such items in places they do not live.

### 4. LAB-TEST RESULTS

During the bench trial, Newmeyer repeatedly argued that the lab-test results were inadmissible because Rebecca Crum, the author of the report, was unavailable to testify, and the descriptions of the items tested did not match the descriptions of what was taken from the residence. He additionally attacked a discrepancy between reports from Children's Protective Services and law enforcement regarding what evidence was sent to the crime lab. Newmeyer also argued that, because different witnesses described the butane-hash oil and the pie crust in different ways, the Department failed to establish a proper chain of custody to determine whether the items the crime lab tested were actually taken from the residence.

According to Newmeyer, he had seen butane-hash oil get made in the past; it was "[y]ellow, green, or brown" and relatively transparent. The liquid in the refrigerator did not look like butane-hash oil to Newmeyer. Deputy Director Varley, however, testified that he had seen butane-hash

oil in about four different colors. The butane-hash oil in this case was universally described as dark.

When the butane-hash oil and the pie crust were taken from the residence, Deputy Director Varley described the butane-hash oil as "black syrup," but noted that he could see "plant material" in it when holding the butane-hash oil up to the light. In contrast, Sergeant Damveld did not see anything in the butane-hash oil "except for the liquid itself." As for the pie crust, Deputy Director Varley described it as "whitish-green."

Deputy Director Varley testified that he sent samples of the pie crust and the butane-hash oil to the Michigan State Police Crime Lab. In contrast, DeJonghe's petition to remove BNM from Newmeyer's custody stated that the crime lab tested butane-hash oil and "finely cut marijuana," but DeJonghe's understanding as explained during the bench trial was that police sent the butane-hash oil and pie crust to the crime lab. DeJonghe could not explain why her petition had an incorrect statement.

Turning to the lab report itself, Crum stated in her laboratory report that she tested a "glass vial containing brown liquid and plant material" and a "[b]rown chunky material." Both substances tested positive for THC. Crum, however, was unavailable to testify because she had cancer and was on extended medical leave at the time of the bench trial.

Scott Sietsema, a forensic scientist in the Michigan State Police Crime Lab, was qualified as an expert in controlled substances and conducted a peer review in this case. During his review, Sietsema ensured that the case numbers and lab numbers in the lab report were accurate; he also ensured "that everything matches up to the same thing that is tested and the same thing in the machines." Sietsema additionally reviewed "all the data and the testing to make sure that was done accurately." Based on Sietsema's review, all of the information in Crum's report was correct. Sietsema was also able to view the two items that Crum tested; he saw a "brownish-black liquid" as well as "a chunk of dark yellow (inaudible)" that he identified as pie crust. These items matched the item numbers in the report he received. Sietsema additionally explained that, while the instruments in the crime lab could test for butane, they are not used for that purpose because the crime lab instead focuses on identifying controlled substances and butane is not a controlled substance.

When asked about how and why the pie crust changed color over time, Sietsema explained that it was "very possible" that a food product such as pie crust would change color over time. Additionally, food products generally turn darker over time. Sietsema did not closely examine the color of the pie crust when he looked at it and opined that he possibly looked at a different part of it compared to what Crum did. In summary, Deputy Director Varley described the pie crust a "whitish-green," Crum described it as "[b]rown," and Sietsema described it as "dark yellow."

As for the butane-hash oil, Sietsema did not examine it closely, but he did not notice any seeds in it. Crum's report also does not mention any seeds, but it did mention "plant material." In contrast, Deputy Director Varley saw "plant material" in the butane-hash oil. Finally, Sergeant Damveld did not see anything in the butane-hash oil "except for the liquid itself." Thus, to summarize, Deputy Director Varley and Crum saw plant material in the butane-hash oil, but Sergeant Damveld and Sietsema did not see anything in the butane-hash oil.

-6-

## 5. BUTANE'S DANGER AND USES

Multiple witnesses testified that butane itself can be dangerous. Sergeant Damveld testified that butane-hash oil is made by mixing butane with part of the marijuana plant and that the process was dangerous. Newmeyer repeatedly claimed that he used the butane found at the residence for welding and "scrapping," not to make butane-hash oil. He additionally claimed that his welding equipment was in Kalamazoo. BNM's mother, however, testified that Newmeyer used butane to make butane-hash oil when she was pregnant with BNM. No welding equipment was found at the residence.

## 6. BNM'S SAFETY

Multiple witnesses testified about BNM's safety at the residence. The Department's witnesses testified that they were concerned that BNM could access butane and marijuana at the residence. They were additionally concerned that BNM had access to the refrigerator as well as the marijuana-pie crust and butane-hash oil. According to Newmeyer, however, the marijuana found in the basket on the porch did not belong to him, and he used the butane for welding. Regarding the butane-hash oil, pie crust, and shaved marijuana found during the search, Newmeyer testified that if he knew that the pie crust and butane-hash oil were at the residence, he would have locked them away before BNM arrived. Finally, Newmeyer also testified that BNM was barely at the residence and that she was exceptionally well behaved while in his care.

## 7. DEJONGHE'S RISK-ASSESSMENT CONCLUSIONS

During the bench trial, DeJonghe was asked to explain her risk-assessment conclusions that led her to recommend placing Newmeyer on the Central Registry. DeJonghe began by addressing her neglect-factor-scoring decisions—the only scoring decisions at issue in this case. As explained by DeJonghe, N1 ("[c]urrent complaint and/or finding includes neglect") was scored at two points if there was a complaint of neglect as in this case. Regarding N2 ("[n]umber of [p]rior assigned neglect complaints and/or findings"), even unsubstantiated complaints count and, therefore, two unsubstantiated complaints would lead to a score of two for N2. Accordingly, DeJonghe assessed two points for N2 because there were at least two prior complaints or signs of neglect. She assessed one point for N4 ("[p]rimary caretaker's social support") because she believed that Newmeyer's support system—his girlfriend and parents—enabled his substance abuse and did not try and stop him from having BNM around that danger. She assessed one point for N6 ("[p]rimary caretaker provides inadequate physical care and/or inadequate supervision of child(ren)") because Newmeyer allowed BNM to be present in "a drug residence," which was not appropriate for a child her age. Specifically, DeJonghe focused on the presence of "unsecured marijuana" in the residence when scoring this factor.

DeJonghe assessed two points for N8 ("[p]rimary caretaker involved in harmful relationships") because BNM's mother referenced multiple instances of domestic violence. BNM's mother told DeJonghe that there were "several" instances of domestic violence, but BNM's mother did not give any information more specific than that and DeJonghe did not ask for more specific information on that issue. DeJonghe also clarified, however, that for scoring purposes it did not matter if a parent was the perpetrator or a victim of domestic violence. According to Newmeyer, he never struck BNM's mother, but she did strike him. DeJonghe

assessed one point for N9 ("[p]rimary caretaker has a substance abuse problem") because, although Newmeyer had a prescription for marijuana, he should not have allowed it to be accessible by BNM. Finally, regarding N11 ("[p]rimary caretaker able to put child needs ahead of own"), DeJonghe concluded that Newmeyer placed his own needs ahead of BNM's needs because of the June 8, 2018 search. The June 8, 2018 search formed the basis for Newmeyer's N6, N9, and N11-scoring decisions.

In total, Newmeyer's neglect score was ten points, which was "intensive." Accordingly, DeJonghe's risk assessment concluded that this was a "Category One" case that mandated Newmeyer's placement on the Central Registry.

### 8. RELATED CHILD-PROTECTIVE PROCEEDING

DeJonghe filed a petition in family court to remove BNM from Newmeyer's care; that petition was based on the same information that led to the placement of Newmeyer's name on the Central Registry in this case. A referee authorized the petition in Allegan County Family Court case no. 18-59854-NA. In the same order that authorized the petition, however, the referee concluded that Newmeyer did not present a substantial risk of harm to BNM and permitted Newmeyer to have parenting time with BNM at the residence after the residence was inspected. Although the trial court authorized the petition, the trial court ultimately dismissed the petition by consent of "all parties" in October 2019.

### 9. THE ADMINISTRATIVE LAW JUDGE'S OPINION AND ORDER

The administrative law judge issued a written opinion and order following written closing arguments from Newmeyer and the Department. The administrative law judge concluded that Newmeyer lived at the residence and that his testimony about using butane for purposes other than producing butane-hash oil was not credible. Rather, the administrative law judge concluded that the most likely explanation was that Newmeyer was making butane-hash oil at the residence. Additionally, the liquid found in the refrigerator was butane-hash oil and the fact that the pie crust changed color over time was not an issue given Sietsema's credible testimony that baked goods can change color over time. The administrative law judge further found that Newmeyer's testimony that the shaved marijuana on the porch, the butane-hash oil, and the pie crust did not belong to him was not credible. Instead, those items most likely belonged to him. Similarly, the administrative law judge concluded that Newmeyer's testimony that BNM always followed directions was not credible. Rather, BNM was likely to interact in some way with the butane-hash oil, pie crust, and marijuana found at the residence. Furthermore, the administrative law judge concluded that Newmeyer was not coerced into allowing Buell and Deputy Director Varley to search the residence because he had an opportunity to discuss the issue with his attorney and he could have challenged any suspension of his parenting time. The administrative law judge found that small discrepancies regarding descriptions of the evidence taken from the residence and tested by the crime lab were insufficient to break the chain of custody for those items. The administrative law judge then addressed the refrigerator and concluded that regardless of where the butane-hash oil and pie crust were located in the refrigerator, BNM could find a way to access them. The administrative law judge determined that BNM had even easier access to butane cannisters and marijuana inside the residence.

The administrative law judge then turned to the risk assessment. The administrative law judge concluded that this case was properly a Category-I case because DeJonghe filed a child-protective-proceeding petition. The fact that the resulting child-protective proceeding was later settled did not change the fact that a petition was filed. The administrative law judge affirmed all of DeJonghe's risk-assessment scoring decisions with the exception of N8, which was for domestic violence. Regarding the N4 finding, the administrative law judge "inferred" from Newmeyer's criminal history that "the social support he is receiving has had a negative impact because his problems have persisted." The administrative law judge also criticized Newmeyer's father for "downplay[ing] and minimize[ing]" the allegations in this case as well as Newmeyer's 2014 criminal case. The administrative law judge concluded that no evidence established that Newmeyer perpetrated any domestic violence so it found inadequate evidence to support assessing two points for N8. The administrative law judge concluded that even after removing the two points scored for N8, the risk assessment still had a neglect score of eight, which was "high risk." That scoring decision "coupled with the substantiation for improper supervision and threatened harm" made this a Category-II case that still warranted placing Newmeyer's name on the Central Registry. Thus, the administrative law judge concluded that Newmeyer's name was properly placed on the Central Registry.

Newmeyer filed a motion for reconsideration, which was denied.

## C. CIRCUIT COURT PROCEEDINGS

Newmeyer appealed the administrative law judge's decision to the circuit court. Newmeyer repeated many of his earlier arguments, arguing that the facts of the case and res judicata established that BNM was not in danger while in his care; evidence of the butane-hash oil and the pie crust was inadmissible; and the risk-assessment scoring system was "rigged to find people guilty rather than find the truth." The Department responded and repeated its prior arguments that the evidence the administrative law judge considered was admissible, the evidence established that BNM was in danger while in Newmeyer's care and res judicate did not apply, and the risk-assessment procedure was constitutional.

The circuit court affirmed the administrative law judge's decision in a written opinion and order. The circuit court began by affirming the administrative law judge's factual findings that the Department's witnesses were credible, the pie crust and butane-hash oil were in Newmeyer's control in the residence, Newmeyer lived at the residence, and BNM would have been harmed while in Newmeyer's care. The circuit court additionally concluded that the evidence the administrative law judge relied on was admissible because of the relaxed evidentiary standards applicable to administrative proceedings.

The circuit court concluded that Newmeyer was not coerced when he allowed Buell and Deputy Director Varley to inspect the residence. The circuit court reached this conclusion by deferring to the administrative law judge's factual findings and concluding that Newmeyer's ability to walk away from Buell and Deputy Director Newmeyer while talking with his attorney "allowed Mr. Newmeyer's consent to be given specifically, unequivocally, freely, and intelligently." Relatedly, Newmeyer failed to produce any evidence that Deputy Director Varley intentionally failed to state—in his search-warrant affidavit—that Sergeant Damveld's field test of the butane-hash oil was inconclusive. Thus, the search warrant was valid. The circuit court

next concluded that res judicata did not apply because the child-protective proceeding could not have removed Newmeyer's name from the Central Registry; only the Department had the authority to do that. Finally, the circuit court concluded that Newmeyer failed to show that the risk-assessment proceeding was unconstitutional. Consequently, the circuit court affirmed the administrative law judge's decision to keep Newmeyer's name on the Central Registry.

This appeal followed.

## II. ANALYSIS

### A. SEARCH OF THE RESIDENCE

"[W]hen reviewing a lower court's review of agency action this Court must determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings. This latter standard is indistinguishable from the clearly erroneous standard of review . . . ." *Boyd v Civil Serv Comm*, 220 Mich App 226, 234; 559 NW2d 342 (1996). Administrative agency rulings must be authorized by law and "supported by competent, material and substantial evidence on the whole record." *Id*. at 232 (quotation marks and citation omitted). "A finding is clearly erroneous where, although there is evidence to support the finding, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made." *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 652; 662 NW2d 424 (2003). Additionally, "[d]eference must be given to an agency's findings of fact, especially with respect to conflicts in the evidence and the credibility of witnesses." *Huron Behavioral Health v Dep't of Community Health*, 293 Mich App 491, 497; 813 NW2d 763 (2011) (citations omitted).

This Court reviews de novo questions of constitutional law. *Janer v Barnes*, 288 Mich App 735, 737; 795 NW2d 183 (2010). "Whether a consent [to a search] is valid is a matter of fact based upon the evidence and all reasonable inferences to be drawn from it." *People v Chism*, 390 Mich 104, 123; 211 NW2d 193 (1973). This Court reviews for clear error the trial court's finding regarding the validity of the consent to search. *Id*. See also *People v Mahdi*, 317 Mich App 446, 460-461; 894 NW2d 732 (2016).

We note that, because Newmeyer is appealing the circuit court's opinion and order that reviewed the administrative law judge's decision, although we are reviewing the circuit court's opinion and order, much of our analysis focuses on the administrative law judge's opinion and order. This is because the circuit court sat as an appellate court in this case and, as such, made legal determinations that are not entitled to deference by this Court. See *Mericka v Dep't of Community Health*, 283 Mich App 29, 35; 770 NW2d 24 (2009).

### 1. COERCIVENESS OF THE SEARCH

Newmeyer first argues that the search of the residence was improper because the threat to his parenting time with BNM coerced him into allowing Buell and Deputy Director Varley to search the residence. Before addressing the merits of this issue, we note that neither party considered whether the Fourth Amendment actually applies in this case. The Fourth Amendment is usually applied in the criminal context, not a civil-administrative context like this one. *Long*

*Lake Twp v Maxon*, ___ Mich App ___, ___; ___ NW2d ___ (2021); slip op at 3. "[T]he Fourth Amendment," however, "may protect parties from unreasonable searches and seizures committed by a governmental entity in civil cases, if the civil case can be considered 'quasi-criminal' and the search or seizure was committed by the governmental entity pursuing the action." *Id.* Children's Protective Services was involved in the search, and it placed Newmeyer on the Central Registry. Placement of Newmeyer's name on the Central Registry is a punitive response to his failure to care properly for BNM. Therefore, we will assume without deciding that the Fourth Amendment applies here.

"Consent is an exception to the warrant requirement. The consent exception permits a search and seizure if the consent is unequivocal, specific, and freely and intelligently given." *Mahdi*, 317 Mich App at 460 (citations omitted). "The consent must be given by the person whose property is searched or from a third party possessing common authority over the property." *Id.* "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Id.* at 461 (cleaned up).

The administrative law judge did not make an explicit finding regarding whether Buell or Deputy Director Varley actually told Newmeyer that his parenting time—or the enforcement of his parenting time—would be suspended if he did not allow them to search the residence. Rather, the administrative law judge stated that Children's Protective Services had the authority to do so if Newmeyer did not consent to the search of the residence. The administrative law judge did, however, find that Newmeyer was able to walk freely while talking to his attorney about whether he should consent to the search and that he did allow Buell and Deputy Director Varley to search the residence. The administrative law judge also found that Newmeyer could have contested any suspension of modification of his parenting time. After making these findings of fact, the administrative law judge concluded that Newmeyer validly consented to the search of the residence and, therefore, that he was not coerced into doing so.

For its part, the circuit court concluded that it was uncontested that Buell told Newmeyer that his parenting time would be suspended if he did not allow Buell and Deputy Director Varley to search the residence. Nevertheless, the circuit court affirmed the administrative law judge because Newmeyer was able to walk away from Buell and Deputy Director Varley and discuss the matter with his attorney before consenting to the search.

The record supports the findings by the administrative law judge and the circuit court. Although Deputy Director Varley initially testified that Buell said Newmeyer's parenting time "could" be negatively affected if he refused to consent to the search, he eventually conceded during the bench trial that Buell likely said that Newmeyer's parenting time "would" be negatively affected in that circumstance. Buell and Newmeyer also testified that Buell said this "would" happen instead of that it "could" happen. Additionally, as explained by Buell, she informed Newmeyer that if she could not search the residence then "possibly [Newmeyer's] parenting time would then have to be suspended for that day because [BNM] was to be dropped off" at the residence. This reduction in Newmeyer's parenting time is much more limited than what Newmeyer presents on appeal: that all of his parenting time would be suspended. Furthermore, all parties agree that Newmeyer was able to walk away and discuss the matter with his attorney before he returned and allowed Buell and Deputy Director Varley to search the residence. It is

also uncontested that Children's Protective Services had the authority to suspend Newmeyer's parenting time and the enforcement of his parenting time.

When considering the totality of the evidence, we are not definitely and firmly convinced that the administrative law judge erred by concluding that Newmeyer validly consented to the search of the residence. Newmeyer is certainly correct that "a parent has a fundamental liberty interest in the care, custody, and management of his or her child, which is constitutionally protected." *In re TK*, 306 Mich App 698, 706; 859 NW2d 208 (2014). And no findings of fact establish whether the administrative law judge viewed as credible Buell's testimony about the limited scope of her threat.

We find the deferential standard of review instructive in this instance because whether Newmeyer was coerced into allowing the search of the residence would present a close call under de novo review. Newmeyer's ability to walk away from Buell and Deputy Director Varley has marginal relevance in this context, as the purported threat made by Buell against Newmeyer was not that his personal liberty was immediately at risk, but rather that his right to see his daughter was immediately at risk. Additionally, the administrative law judge's failure to make a factual finding regarding the scope of the threat to Newmeyer's parenting time complicates this analysis because it deprives this Court of a potentially helpful datum point in the coercion analysis. Those reservations are outweighed, however, by caselaw establishing that an opportunity to talk with an attorney mitigates the potential for coercion, *People v Cipriano*, 431 Mich 315, 345; 429 NW2d 781 (1988), and the deferential standard of review on this issue. Thus, we are not definitely and firmly convinced that the administrative law judge erred by concluding that Newmeyer validly consented to the search of the residence.

## 2. THE SEARCH WARRANT

Newmeyer next argues that the search warrant was invalid because Deputy Director Varley intentionally omitted information in his search-warrant application about Sergeant Damveld's inconclusive field test of the butane-hash oil. The administrative law judge did not make any factual findings on this issue. The circuit court, however, concluded that Newmeyer failed to present any evidence that Deputy Director Varley intentionally omitted information about the butane-hash-oil field test from his affidavit supporting his search warrant application. We note that the search warrant and supporting affidavit were not part of the record before us, but it is uncontested that Deputy Director Varley's affidavit did not address the field test. We additionally note that this issue would normally be reviewed for clear error, see *People v Mullen*, 282 Mich App 14, 22; 762 NW2d 170 (2008), but that because the administrative law judge failed to rule on the issue it now presents a question of law that should be reviewed de novo, see *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 605; 886 NW2d 135 (2016); *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006).

The record supports the circuit court's conclusion. Newmeyer has not presented any evidence establishing that the omission of the result from the search-warrant application was intentional. Indeed, the importance of that test is not even clear given that it produced an "inconclusive" result. Because the result was "inconclusive," the field test did not actually give Deputy Director Varley and Sergeant Damveld any new information. Additionally, Deputy Director Varley and Sergeant Damveld both immediately identified the liquid found in the

-12-

refrigerator as butane-hash oil. And Sergeant Damveld explained that the butane-hash oil was too dark for the field test to return any result other than "inconclusive." Thus, nothing in the record establishes that Deputy Director Varley intentionally omitted information or that the inconclusive test result was particularly material here. Accordingly, the circuit court did not err by concluding that the search warrant was valid. See *Mullen*, 282 Mich App at 24.

## B. ADMISSION OF EVIDENCE

Agency decisions regarding the admission of evidence are reviewed for an abuse of discretion. *Nat'l Wildlife Federation v Dep't of Environmental Quality (No 1)*, 306 Mich App 336, 342; 856 NW2d 252 (2014).

The Administrative Procedures Act provides its own rules regarding the admission of evidence that are distinct from civil and criminal cases. MCL 24.275 addresses the admission of evidence in contested cases under the Administrative Procedures Act and provides:

> In a contested case the rules of evidence as applied in a nonjury civil case in circuit court shall be followed as far as practicable, but an agency may admit and give probative effect to evidence of a type commonly relied upon by reasonably prudent men in the conduct of their affairs. Irrelevant, immaterial or unduly repetitious evidence may be excluded. Effect shall be given to the rules of privilege recognized by law. Objections to offers of evidence may be made and shall be noted in the record. Subject to these requirements, an agency, for the purpose of expediting hearings and when the interests of the parties will not be substantially prejudiced thereby, may provide in a contested case or by rule for submission of all or part of the evidence in written form.

MCL 24.276 addresses documentary evidence and provides that:

> Evidence in a contested case, including records and documents in possession of an agency of which it desires to avail itself, shall be offered and made a part of the record. Other factual information or evidence shall not be considered in determination of the case, except as permitted under section 77. Documentary evidence may be received in the form of a copy or excerpt, if the original is not readily available, or may be incorporated by reference, if the materials so incorporated are available for examination by the parties. Upon timely request, a party shall be given an opportunity to compare the copy with the original when available.

## 1. CHAIN OF CUSTODY

Newmeyer first argues that the chain of custody was not sufficient to establish that the butane-hash oil and pie crust taken from the residence were sent to the crime lab. "[A] perfect chain of custody for evidence" is not required "for evidence to be admitted at trial." *People v White*, 208 Mich App 126, 132-133; 527 NW2d 34 (1994) (citation omitted). Rather, "evidence may be admitted where the absence of a mistaken exchange, contamination, or tampering has been established to a reasonable degree of probability or certainty." *Id*. at 133. Additionally, "gaps in the chain normally go to the weight of the evidence rather than its admissibility" and "the government need only show that it took reasonable precautions to preserve the original condition of the evidence." *Id*. at 132 (citation omitted). "In addition, a presumption of regularity exists with respect to official acts of public officers and, absent any evidence to the contrary, the court presumes that their official duties have been discharged properly." *Id*. (citation omitted).

The administrative law judge concluded that the Department presented competent, material and substantial evidence to establish that the butane-hash oil and the pie crust taken from the residence were tested by the crime lab. Specifically, the administrative law judge found that Newmeyer's argument that small discrepancies in the descriptions of those items invalidated the lab-test results "does not hold up." It further found that the chain-of-custody testimony from Deputy Director Varley, Sergeant Damveld, and Sietsema was credible and sufficient to establish the chain of custody. Finally, the administrative law judge specifically found credible Sietsema's testimony that baked goods can change color over time. The circuit court deferred to the administrative-law-judge's ruling on this issue because the administrative law judge was the finder of fact.

The record supports the administrative law judge's conclusions. Deputy Director Varley testified that he sent the butane-hash oil and the pie crust to the crime lab. The lab report describes a "brown liquid and plant material" and a "[b]rown chunky material." Sietsema testified that he verified that the items tested by Crum were the same items seized in this case. While Newmeyer is correct that there were small discrepancies regarding how the butane-hash oil and pie crust were described, the differences are relatively minor. They do not cast serious doubt on what evidence the crime lab tested. Finally, although documents in other proceedings stated that shaved marijuana—not the marijuana-pie crust—was sent to the crime lab, that discrepancy is most likely a scrivener's error. The lab report and the witnesses in this case clearly establish that the pie crust, not the shaved marijuana, was sent to the crime lab. Accordingly, there is competent, material, and substantial evidence showing a sufficient chain of custody, and we find no error with the administrative law judge's factual findings on this matter requiring reversal.

## 2. ADMISSIBILITY OF THE LAB REPORT

Newmeyer's next argument—that the lab report was inadmissible because he was not able to cross-examine Crum—requires an analysis of MCL 24.272(4). That statute provides in relevant part: "A party may cross-examine a witness, including the author of a document prepared by, on behalf of, or for use of the agency and offered in evidence. A party may submit rebuttal evidence." According to Newmeyer, the lab-test results are inadmissible because he was not able to cross-examine their author, Crum. But Newmeyer's argument stumbles out of the gate because nothing in MCL 24.272(4) establishes that a document cannot be admitted into evidence if its author was

not made available for cross-examination. Additionally, Newmeyer's suggested interpretation of MCL 24.272(4) runs afoul of MCL 24.275 and MCL 24.276. Under MCL 24.275 "an agency may admit and give probative effect to evidence of a type commonly relied upon by reasonably prudent men in the conduct of their affairs." "In light of the 'reasonably prudent men' standard in MCL 24.275, it is now established that evidentiary rulings in administrative proceedings may stray from rigid courtroom rules on evidence." *In re Sangster*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 352147); slip op at 6-7.

The lab-test results were peer-reviewed by Sietsema, who testified about his peer review during the bench trial. Additionally, although the results of the lab test were hearsay because they were offered for the truth of the matter asserted, MRE 801(c), they would likely have been admissible as a record of a regularly conducted activity, MRE 803(6), a public record, MRE 803(8), or because Crum was unavailable as a witness due to her cancer treatment, MRE 804. Each of these would have permitted the Department to admit the lab-test results into evidence in a civil case, and MCL 24.275 provides for an even more lenient evidentiary standard in administrative proceedings. Furthermore, the lab-test results were admissible under MCL 24.276 because they were documents in the Department's possession of which it desired to avail itself. See MCL 24.276. MCL 24.276 mandates that such documents must be made part of the record.

The different provisions of the Administrative Procedures Act should be read together as a consistent whole. *Gebhardt v O'Rourke*, 444 Mich 535, 542; 510 NW2d 900 (1994). With that principle in mind, MCL 24.272(4) does not make the lab-test results inadmissible even though Newmeyer was not able to cross-examine Crum. While MCL 24.272(4) does provide that Newmeyer should have an opportunity to cross-examine witnesses and the author of a report the Department relies on, it does not mandate the exclusion of a report if cross-examination of the author does not occur. Indeed, such a result would be contrary to other provisions of the Administrative Procedures Act, namely MCL 24.275 and 276. It would also lead to an absurd result by creating a higher bar for the admission of evidence than is applicable in a nonjury civil case, which would conflict with MCL 24.275. Thus, the administrative law judge and the circuit court did not err by admitting the lab-test results into evidence.

## 3. CRIMINAL HISTORY

Newmeyer argues that the administrative law judge erred by considering his criminal history. Newmeyer argued that the administrative law judge should not consider evidence related to his criminal history because it was based on hearsay and the result of police misconduct. Newmeyer, however, failed to make this argument when he appealed to the circuit court. Thus, because Newmeyer failed to raise the issue at the circuit court level, the issue is unpreserved. See *Whitman v Galien Twp*, 288 Mich App 672, 677-678; 808 NW2d 9 (2010).

As a general rule, "a failure to timely raise an issue waives review of that issue on appeal." *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008) (quotation marks and citation omitted). We are unaware of any case addressing a petitioner's attempt to remove his name from the Central Registry that had an unpreserved issue. In most civil contexts, the failure to preserve is a waiver that cannot be reviewed on appeal. See *id*. In quasi-criminal and criminal actions, however, this Court reviews unpreserved issues for plain error. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999); *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011).

This Court has also applied the plain-error standard to unpreserved claims of error raised in child-custody cases. *Demski v Petlick*, 309 Mich App 404, 441-442; 873 NW2d 596 (2015). Accordingly, out of an abundance of caution, we will review Newmeyer's unpreserved criminal-history argument for plain error. *Hogg v Four Lakes Ass'n, Inc*, 307 Mich App 402, 406; 861 NW2d 341 (2014).

"To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.* (quotation marks omitted), citing *Carines*, 460 Mich at 763. "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). The appellant bears the burden of persuasion with respect to prejudice. See *Carines*, 460 Mich at 763.

Newmeyer argues that the administrative law judge erred by considering his criminal history because his 2014 conviction was the result of police misconduct and all evidence of his criminal history was hearsay. Newmeyer made these same arguments during the bench trial and they were repeatedly rejected by the administrative law judge. The administrative law judge did not err by doing so. Information about Newmeyer's 2014 conviction was used by DeJonghe and the administrative law judge for the limited purpose of establishing that Newmeyer had a criminal history; DeJonghe and the administrative law judge did not focus on the underlying facts of the 2014 case. Rather, they each focused on the fact that the 2014 case resulted in a conviction after Newmeyer pleaded guilty. Newmeyer's arguments on appeal are essentially that the administrative law judge should not have considered his 2014 conviction at all because of mitigating factors and hearsay. But, as noted earlier, hearsay is admissible in administrative proceedings, and the administrative law judge did not abuse any discretion by admitting evidence of Newmeyer's criminal history because that is the type of evidence a reasonably prudent person would have relied on. See MCL 24.275. Additionally, Newmeyer's argument that there were mitigating factors surrounding his 2014 conviction go to the evidence's weight, not its admissibility. The administrative law judge had all of that information before it and concluded that Newmeyer's criminal history was relevant for the purpose of showing that he had a criminal history. It did not err by doing so.

## C. RES JUDICATA

Newmeyer next argues that res judicata requires the removal of his name from the Central Registry due to how the child-protective proceeding concluded. "The determination whether res judicata bars a lawsuit involves a question of law, which we review de novo." *Verbrugghe v Select Specialty Hosp-Macomb Co, Inc*, 279 Mich App 741, 744; 760 NW2d 583 (2008).

The Department argues that Newmeyer abandoned this issue. The entirety of Newmeyer's legal argument addressing the standard for res judicata is the following:

> The Circuit Court correctly cites the law of res judicata in Michigan in the
> second paragraph under Res Judicata on page 8 of its Opinion, but then fails to
> follow that law: Michigan follows the broad rule: every claim which could be
> pursued in a case is regarded as pursued and resolved in that case even if it is not

actually pursued. See also <u>Gose v. Monroe Auto Equipment</u>, 409 Mich 147, 159-163 (1980).

The circuit court did cite the standard for res judicata on page eight of its opinion. As such the issue is not abandoned because Newmeyer did direct this Court to a statement of law on this issue even though he failed to articulate the standard in his brief. See *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015). Accordingly, we address Newmeyer's res-judicata argument on the merits.

Res judicata is a judicial doctrine constructed to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v McCurry*, 449 US 90, 94; 101 S Ct 411; 66 L Ed2d 308 (1980). Res judicata bars a party's subsequent action if "(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Adair v State*, 470 Mich 105, 121; 680 NW2d 386 (2004).

The administrative law judge did not address Newmeyer's res-judicata argument, but the circuit court concluded that res judicata did not apply because the child-protective proceeding could not have removed Newmeyer's name from the Central Registry. The circuit court was correct.

This Court has previously concluded that the Department, not the trial court in a child-protective proceeding, has "exclusive jurisdiction in maintaining and removing a person's name from the central registry." *In re Harper*, 302 Mich App 349, 361; 839 NW2d 44 (2013). In *In re Harper*, the Department filed a petition for the trial court to take jurisdiction over the respondent's child. *Id*. at 351. This resulted in placement of the respondent's name on the Central Registry. *Id*. at 351-352. The trial court authorized the petition and took jurisdiction over the child, but the respondent's situation later improved so the trial court terminated its jurisdiction and closed the case. *Id*. at 352. The respondent then moved for the trial court to remove her name from the Central Registry; the trial court granted the respondent's motion. *Id*. The Department filed a request for the trial court to set aside its order removing the respondent's name from the Central Registry, arguing that MCL 722.627 granted the Department, not the trial court, exclusive control over names on the Central Registry. *Id*. The trial court denied the Department's request and the Department appealed. *Id*.

On appeal, this Court agreed with the Department and concluded that the Department, not the trial court, had exclusive control over names on the Central Registry. *Id*. at 361. Specifically, this Court concluded that MCL 722.627 established "a comprehensive statutory scheme for situations, like here, where an individual desires removal from the central registry." *Id*. at 355. "Allowing respondent to evade the department's role in this process would subvert the statutory scheme of MCL 722.627, which in turn would ignore the Legislature's intent." *Id*. at 356. This Court further explained that a respondent must first exhaust his administrative remedies by proceeding under MCL 722.627 before he asks a trial court to expunge his name from the Central Registry. *Id*. at 358-361.

*In re Harper* examined a prior version of the Child Protection Law. The Legislature has amended the Child Protection Law multiple times since then. Compare 2011 PA 70 with 2014 PA 30 and 2018 PA 56. Today, the Child Protection Law provides, in relevant part, that "[i]f the investigation of a report conducted under this act does not show child abuse or child neglect by a preponderance of evidence" or if the trial court "dismisses a petition based on the merits of the petition . . . because the petitioner has failed to establish that the child comes within the jurisdiction of the court" then "the information identifying the subject of the report *shall be expunged from the central registry*." MCL 722.627(7) (emphasis added). This subsection requires mandatory action by the Department to expunge a name from the Central Registry that does not rely on the normal agency proceeding at issue in this case. Thus, to the extent *In re Harper* concluded that the Department had sole discretion and exclusive control over when and how names are expunged from the Central Registry, that holding has been abrogated in part by the Legislature.

That said, MCL 722.627(7) is not relevant to this case because the record before us does not establish that the trial court in the child-protective proceeding dismissed the petition on the merits; rather, the child-protective proceeding was dismissed by consent of all the parties. Consequently, the trial court in the child-protective proceeding could not have removed Newmeyer's name from the Central Registry for the reasons explained in *In re Harper*. Thus, that issue could not have been decided in Newmeyer's child-protective proceeding. Accordingly, res judicata does not apply in this case. See *Adair*, 470 Mich at 121.

## D. CONSTITUTIONALITY OF THE RISK-ASSESSMENT PROCEDURE

Newmeyer next argues that the risk-assessment procedure is unconstitutional. The entirety of Newmeyer's legal argument in that portion of his brief is the following:

> Thus, the risk assessment favors finding guilt over finding truth and creates an affirmative risk of finding the innocent guilty, effects which violate due process and fundamental fairness, 16B Am Jur 2d s. 968, pp 481-483; s. 969, p 4845; s. 970, p 485-486; & s. 971, p 487.

Newmeyer did not specify what article or amendment of the Constitution his argument was based on. He similarly failed to identify whether his constitutional argument was based on the Michigan or United States Constitution. Relatedly, Newmeyer failed to identify the legal principles behind finding agency actions unconstitutional. Rather, he simply announced a position and left it for this Court to rationalize the basis for his claim. Accordingly, Newmeyer has abandoned the issue. See *Cheesman*, 311 Mich App at 161.

## E. NEGLECT

Newmeyer argues that he did not neglect BNM based on the standard of neglect articulated in *People v Tennyson*, 487 Mich 730; 790 NW2d 354 (2010). In *Tennyson*, our Supreme Court addressed whether the defendant neglected his child and, therefore, was guilty under a criminal statute, MCL 750.145. *Id*. at 732-733. As explained in *Tennyson*, MCL 750.145 incorporated the definition of neglect from MCL 712A.2. *Id*. at 736. Specifically, *Tennyson* defined "neglect" for those purposes as providing the trial court with jurisdiction over a minor

[w]hose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. [*Id*. at 745, quoting MCL 712A.2(b)(1).]

*Tennyson* additionally defined "neglect" as providing the trial court with jurisdiction over a minor

[w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. [*Id*., quoting MCL 712A.2(b)(2).]

In contrast, the Child Protection Law merely requires "threatened harm":

(k) "Child neglect" means harm or threatened harm to a child's health or welfare by a parent, legal guardian, or any other person responsible for the child's health or welfare that occurs through either of the following:

(i) Negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or by the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care.

(ii) Placing a child at an unreasonable risk to the child's health or welfare by failure of the parent, legal guardian, or other person responsible for the child's health or welfare to intervene to eliminate that risk when that person is able to do so and has, or should have, knowledge of the risk. [MCL 722.622(k).]

Thus, *Tennyson* is not applicable because it relied on a different—and more stringent—definition of neglect than is at issue in this case.

## F. RISK-ASSESSMENT FINDINGS

Newmeyer argues that the administrative law judge erred when completing Newmeyer's risk assessment. He relatedly argues that no evidence connected him to the residence.

Newmeyer argues that nothing connects him to the butane-hash oil, the pie crust, or the shaved marijuana found on the porch. Specifically, Newmeyer argues that he cannot be held responsible for those items because he did not have exclusive control over them. But the administrative law judge found that those items belonged to Newmeyer. The administrative law judge based that conclusion on the presence of Newmeyer's checkbook, driver's license, passport, and prescription drugs being in the residence's bedroom. Additionally, the record establishes that BNM's mother saw Newmeyer's vehicle at the residence on multiple occasions, his dog was at the residence, and Newmeyer had BNM's mother drop off BNM for parenting time at the residence on multiple occasions. Thus, there was competent, material, and substantial evidence in the record

to connect Newmeyer to the residence. Newmeyer's arguments that either an unknown individual or law enforcement placed those items in the residence without his knowledge are unconvincing. Additionally, the administrative law judge rejected these same arguments and this Court must defer to the administrative law judge's factual and credibility determinations. Thus, the Department presented competent, material, and substantial evidence to connect Newmeyer to the residence, the butane-hash oil, the pie crust, and the marijuana shavings.

We turn to Newmeyer's argument that the risk-assessment score was improper. On appeal, Newmeyer does not address each of the individual risk-assessment scoring factors. He instead argues that the risk assessment was not properly scored because it was based on circumstantial evidence. But courts rely on circumstantial evidence on a regular basis. See, e.g., *Skinner v Square D Co*, 445 Mich 153, 163-164; 516 NW2d 475 (1994); *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019). Consequently, circumstantial evidence may be considered when reviewing Newmeyer's risk-assessment score.

On June 8, 2018, Newmeyer was scheduled to have parenting time with BNM at the residence. He had a basket on the porch of butane cannisters with a bag of shaved marijuana at the bottom. The basket was open and would have been easily accessible to BNM. Multiple witnesses testified about how dangerous butane can be if not handled correctly and a four-year-old would hardly be expected to know how to properly handle it. Additionally, the butane-hash oil and marijuana-pie crust were in the refrigerator that day. While the parties spent a considerable amount of time addressing where specifically those items were in the refrigerator, the administrative law judge concluded that—regardless of where the items were located in the refrigerator—they posed a danger to BNM because BNM could simply find something to help her reach higher and farther into the refrigerator if she was left unattended. The administrative law judge also found that Newmeyer's assertion that BNM always followed the rules was not credible. We are not left with a definite and firm conviction that the administrative law judge erred by making any of these findings.

We note, however, that the administrative law judge affirmed each of DeJonghe's scoring decisions except for the N8-domestic-violence scoring decision. DeJonghe testified about each scoring factor at the bench trial and explained her reasoning. Our review of the record generally supports the administrative law judge's risk-assessment findings. Regarding N1 and N2, the complaint in this case involved a finding of neglect and Newmeyer had more than two prior assigned neglect cases. Regarding N4, Newmeyer had a history of criminal activity related to marijuana that extended to the current case; DeJonghe and the administrative law judge inferred from this history that Newmeyer's friends and family had a negative effect on him. Regarding N6, Newmeyer provided inadequate supervision of BNM because he allowed her to be at the residence when it had the butane on the porch during prior visits; he also intended to have her present on June 8, 2018, even though butane-hash oil and the marijuana-pie crust were in the refrigerator. Regarding N9, Newmeyer had a substance-abuse problem because he reported consistently using marijuana. Finally, regarding N11, Newmeyer did not put BNM's needs ahead of his own because he did not ensure the residence would be safe for her. The record supports each of these findings, with the possible exception of the N4 finding.

Regarding the N4 finding, the administrative law judge found that N4 was met because Newmeyer's family and friends supported him and did not change his conduct as it related to

marijuana. Essentially, the administrative law judge inferred from Newmeyer's conduct that his social circle enabled his marijuana use and potential criminal activity. The record is scant, however, with respect to Newmeyer's social circle. His girlfriend did appear to cover for him with respect to his residence, though this alone is not particularly egregious. His father has certainly supported him throughout these proceedings, but it must be stressed that the father was and remains Newmeyer's attorney. Newmeyer's father has been a zealous advocate for Newmeyer, both before and during the events in this case. Generally speaking, a tribunal should not hold it against a party that the party has the benefit of zealous advocacy. In this case, this advocacy does not establish that Newmeyer's father actively enabled Newmeyer's marijuana use and potential criminal activity. Rather, it merely established that Newmeyer's father is faithfully discharging his duties as an attorney.

With that said, even if we assume that there was error in scoring N4, this would not warrant reversal. Removing the single point assessed for N4 would bring Newmeyer's risk-assessment score to seven, which still results in a "high" initial-risk level. That score correlates to a "Category II" case that mandates placement of Newmeyer's name on the Central Registry. See MCL 722.628d(1)(d). Thus, we are not left with a definite and firm conviction that the administrative law judge erred by concluding that the risk-assessment mandated placement of Newmeyer's name on the Central Registry.

## III. CONCLUSION

For the reasons stated in this opinion, we affirm.

/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Brock A. Swartzle